THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RODERICK L. JEFFERIES, Defendant-Appellant.

(No. 71-19;

Fifth District—July 13, 1972.

C. Paul Bradley, of Defender Project, of Mt. Vernon, (Linda West Conley, of counsel,) for appellant.

Don Johnson, State's Attorney, of Pinckneyville, (Jerry B. Smith, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Defendant appeals his conviction of the crime of burglary after a trial by jury. He was sentenced to a term of not less than three nor more than five years in the penitentiary.

Initial consideration must be given to defendant's argument that the trial court committed error in overruling his motion to quash the indictment. His motion was founded upon the premise that fatal prejudice resulted when the statute relating to the selection of a grand jury was violated by the State's Attorney being present at and participating in the selection of the grand jurors who returned the indictment against defendant. The relevant statute is ch. 78, sec. 9, Ill. Rev. Stat., which governs the drawing of a grand jury in counties not subject to the Jury Commissioners Act. (Ill. Rev. Stat., ch. 78, secs. 24—35.) Amendments to this statute enacted by the legislature in 1969 made substantial changes in the manner of selecting a grand jury by requiring the names of the grand jurors to be drawn from the jury list. Prior to the amendments the persons constituting a grand jury were designated by the county board. The defendant offered as his witness the circuit clerk. The People offered the testimony of the three County Commissioners, the State's Attorney and his secretary. With some minor variation which we deem unimportant the testimony established that the selection of the grand jurors in question was the first time a grand jury had been chosen under the amendatory acts of 1969. The new procedure required the County Board of Commissioners to draw the names of the grand jurors from the jury list. The State's Attorney was in attendance at the regular meeting of the County Board in May 1970 to have them draw a grand jury and to advise them regarding the new procedure to be followed. Prior to the meeting the State's Attorney had prepared a resolution for selection of the grand jury but the names of the jurors were omitted from the resolution. Near the conclusion of other business of the board the State's Attorney advised the board that they had to select a grand jury from the petit jury box and read them section 2 from the Jurors Act relating to the qualifications of grand jurors. The county clerk was instructed to get the jury box, which was done. The jury box contained 1100 to 1200 names. The chairman of the County Board directed the State's Attorney to go ahead and start drawing the names while other

business was being concluded. The State's Attorney and one of the Commissioners then proceeded to draw names from the box, checking them as they were drawn to determine whether their names were already on a previously selected petit jury list. Forty-three names were drawn from the box by the State's Attorney and the Commissioner. Afterward the State's Attorney read each name to the board to determine whether they had the requisite qualifications of grand jurors. Several were rejected because someone thought they were dead, infirm or had a previous criminal record or some other disability that would prevent their service. The rejected names were returned to the box and additional names drawn to make up a total of 43. All the tickets containing the names were then turned over and the members of the County Board drew 23 names which became the regular panel and the remaining 20 names became the supplemental panel. At the close of the meeting the State's Attorney took the two piles of names and put them in separate envelopes, identified as regular panel and supplemental panel, and gave them to his secretary to type into the resolution which had been previously prepared. The circuit clerk's testimony was at some variance with this. He stated that the State's Attorney picked up all 43 names and said he would take the first 23 as the regular panel and the remainder as the supplemental panel. The clerk testified that there was an excess of names drawn before the Commissioners made their selection and that the excessive names were returned to the box after the drawing. The State's Attorney testified that he never at any time told the board who to select as grand jurors nor did he even suggest any names to them or give them a prepared list of grand jurors. This testimony was corroborated by the Commissioners.

In rendering its decision denying defendant's motion to quash the indictment the trial court commented as follows:

"The Court is also aware of the fact that the Statutes are written to be followed. Various amendments are made from time to time to try to correct what deficiencies happened or what deficiencies were found in the Statutes. And the Court is also aware of the fact that these defendants or whatever defendants have been indicted by the Grand Jury are going to have, what the Court considers a fair trial. They are going to be confronted by witnesses. They are going to be represented by counsel. The Grand Jury is a very important process in our government. Although, in this particular instance where everything was laid on the table, everybody was present, the Court doesn't believe there was any ulterior motive in disregarding some of the substantial parts of the Statutes which he did disregard. And that it won't happen in the future. I believe if I could see a situation where the State's At-

torney might dismiss the Board and say I'll take care of this later on and let you know or something like that where there was some kind of subterfuge or concealment carried out. But as I said, I believe everything was laid on the table and in the Court's opinion there was no effort to put particular persons on a supplemental or on a regular panel or Grand Jury list. Consequently, despite the well presented arguments of counsel for the Defendant, the Court is going to overrule your Motion."

Defendant places principal reliance upon the cases of *People v. Mack* (1937), 367 Ill. 481, 11 N.E.2d 965, and *People v. Lindquist* (1937), 289 Ill.App. 250, 7 N.E.2d 166. In *Mack* the alleged impropriety in selection of a grand jury arose when the Cook County Sheriff, at the court's direction, selected eight persons from the body of the county to complete the regular panel of grand jurors, that number being absent on the day designated for the grand jury to sit. There was a conflict in the application of the statute regarding selection of grand jurors in counties having a population of more than 250,000. The general statute relating to selection of jurors was, by what the court termed an anomaly, made applicable to the criminal court of Cook County. It authorized the action of the sheriff in filling the panel. The "anomaly" was later removed by appropriate legislation. The Jury Commissioners Act (Smith-Hurd Ill. Stat., ch. 78, sec. 32) regulated procedure for selecting grand jurors in Cook County and by its terms additional names as needed were to be drawn by lot from the jury commissioners list. The court held that the general statute regarding the selection of grand jurors did not control over the Jury Commissioners Act and that therefore it was error to fill the incomplete panel by having the sheriff select eight persons from the body of the county. The court found that there was no substantial compliance with the statute relating to selection of grand jurors and held the indictment void, stating "The rule that mere irregularities in the selection of a jury will not constitute reversible error is applicable only where there has been an attempt to follow the law and there has been some irregularity in doing so." The *Lindquist* case was also a case arising in Cook County and involved a situation similar to that of the *Mack* case and the Appellate Court reached the same conclusion as the Supreme Court had in *Mack*.

The court in the *Mack* case took note of *People v. Lieber*, 357 Ill. 423, 192 N.E. 331, where it was shown that 60 names, rather than the required 23, were drawn from the grand jury list and they were summoned to court. Several of the panel of 60 failed to appear or were excused for reasons unknown, and the clerk then drew by lot from those remaining

out of the 60 to make a panel of 23. The court found that the 23 who were finally selected and sworn as the grand jury who found the indictment against Lieber were drawn and certified by those legally constituted to draw and certify the panel or list of grand jurors and were otherwise qualified to serve as such. It was held that a substantial compliance with the law providing for the drawing and impaneling of a grand jury is all that is required unless the record shows improper influence, undue prejudice or other matters which might have caused a true bill to be improperly returned. The court then overruled some prior decisions to the contrary and declared the following rule: "In order to remove any further doubt on the subject, we now hold that the provisions of the Jurors act and Jury Commissioners act, in so far as they relate to the manner of selection of grand jurors, are directory and not mandatory, unless the substantial rights of the accused are injuriously affected by the methods pursued."

The *Mack* case, curiously, omitted any reference to the case of *People v. Bain*, 358 Ill. 177, 193 N.E. 137, where the court observed that under the factual situation present "The procedure was at least novel, *even though without any semblance of complying with the requirements of the statute.*" (Emphasis supplied.) It was nevertheless held that under the authority of *People v. Lieber, supra,* they were required to hold the trial court did not err in refusing to quash the indictment.

*People v. Herkless*, 361 Ill. 32, 196 N.E. 829, followed *Lieber* and refused to avoid a grand jury that had been selected by a subcommittee of the Board of Supervisors rather than the full Board of Supervisors as required by the statute. We note that the facts there resemble those of the case under consideration. The most recent case on the subject to which our attention has been called is *People v. Petruso*, 35 Ill.2d 578, 221 N.E.2d 276, in which the court held that it was frivolous upon the part of the defendant to argue that the grand jury was illegal because the clerk of the Board of Jury Commissioners was not present at its selection. The *Lieber* rule was followed, the court saying: "In the absence of any showing of improper influence, undue prejudice or other matters which might have caused a true bill to be improperly returned, the trial court properly refused to quash the indictment on such ground."

Upon consideration of the above authorities it would seem that the *Mack* and *Lieber* cases are not necessarily aberrant but an exceptional instance of irreconcilable conflict between two separate and distinct statutes in effect at the same time. They accordingly have no application to the case under consideration.

Defendant's arguments and citations also omit any reference to and

completely discount the provisions of section 114—1(4) of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat., ch. 38, sec. 114—1(4).) It provides that the court may grant a motion to dismiss an indictment, information or complaint upon the grounds that "The indictment was returned by a Grand Jury which was improperly selected *and* which results in substantial injustice to the defendant;." (Emphasis supplied.) We think this statute is controlling here and indicates the plain intention of the legislature to adopt the rule of the *Lieber* case.

Neither in his motion to quash the indictment, his evidence at the hearing thereon or in his brief here has defendant shown or attempted to show any prejudice which resulted from the proceedings at the drawing of the grand jury. In that connection it is worth while to note that the grand jury was selected and drawn over two weeks before the commission of the crime of which defendant stands accused.

The names of the grand jury in the case at hand were drawn by lot from the jury list which was prepared in accordance with the law. The drawing was in the presence of all the members of the County Board of Commissioners, the circuit clerk and the county clerk. The State's Attorney and one of the Commissioners drew the names from the jury box, testing them against the petit jury list which had been previously selected in order to avoid duplication. Thereafter, the full board participated in the rejection of names of persons who they knew to be deceased or under some other disability that would prevent their serving as grand jurors. The names were then turned face down on the table and the Commissioners proceeded to draw the names of the regular panel and the supplemental panel by lot. It is thus seen that there was an attempt made to follow the statute and that the proper authorities, the Board of Commissioners, did participate in the selection of the jury and did indeed make the final selection. The participation of the State's Attorney in the selection process was at the direction of the Chairman and in the presence of the full board. He certainly was properly present at the meeting in his capacity as legal advisor to the board. That it was his hand that withdrew the names from the box, without more, can scarcely be said to result in such prejudice to defendant that it would deprive him of fair treatment by the grand jury. We would also observe that the State's Attorney is no more an interested third party in criminal prosecutions than would be the sheriff, who, in instances where a special grand jury is ordered pursuant to Ill. Rev. Stat., ch. 78, sec. 19, personally selects and designates every member of the grand jury.

■■ The rule of the *Leiber* case and those that follow it is a just one for the obvious reason that the role of the grand jury in criminal

cases is accusatorial only. As pointed out in the *Lieber* case, the grand jury is not a mandatory requirement under the Constitution of 1870 but could be abolished by the legislature at any time. That legislative power is continued in the 1970 Constitution under Article I, Section 7.

■■ In view of the precedents and the statute we think that the trial court was correct in denying defendant's motion to quash the indictment. We also agree with the trial court that the practice followed in this case, while not prejudicial to the defendant, is nonetheless improper and certainly not to be condoned. At the same time it is understandable that such an event could transpire in light of the confusion that attended the 1969 amendments to the Jurors Act which provided an entirely new procedure for the makeup of the jury lists, both grand and petit.

Defendant argues that the circumstances do not show probable cause to arrest the defendant and conduct a search of his automobile. He contends that the trial court committed reversible error in denying defenant's motion to suppress the evidence taken in what defendant terms an illegal search and seizure. We disagree. The evidence discloses that at about 10:50 P.M. on the evening of defendant's arrest, State Trooper Miller was patrolling in the vicinity of the city park in DuQuoin. He was driving an unmarked police car but it was equipped with a red light and siren. He was in uniform. When he went on duty that evening the City Police had taken him to a "couple of places in town to watch out." One of these places was a vacant house on North Lynden Street that had been burglarized. As he was traveling north on Division Street he noticed a car parked on North Street, headed east. It had only one license plate, its headlights were on and it was parked in front of an abandoned house. The trooper started through the intersection of Division and North Streets, backed up and drove toward the car. As he approached, the car turned down an alley. He did not follow the car down the alley because he had traveled it previously and knew it to be very rough. He went around the block, stopping so as to block the exit of the alley on Park Street. He radioed for a backup from the City Police and got out of his car to talk to the driver (defendant). The trooper described the area where he first observed the automobile as one where there had been a lot of trouble, several break ins, and the area was being kept under surveillance by both City and State Police. There had been at least four break ins in the area. The trooper stated that he "picked on" cars with one license plate. The automobile was an old model Chevrolet. The trooper walked up to the car which was occupied by only the driver, defendant. The trooper asked him for his drivers license and the reply was that he did not have any, that he had never had any. The trooper

then arrested defendant for not having a drivers license and asked him about the car and for its registration. In reply defendant said he did not have any identification or registration for the car and that he borrowed the car from a friend but did not name anyone. Defendant told the trooper that his name was Lee Lence. Other police arrived on the scene. Defendant in response to a request got out of his car. Defendant asked for his coat. The trooper got it out of the back seat of the car but before handing it to defendant he searched it and found a straight blade knife with a blade about three inches long. While getting the jacket he noticed there were several pairs of gloves on the floor of the car. The trunk of the automobile was then searched. The first thing found was a box with the address of the vacant house that had been burglarized. There was also an old suitcase, a toaster and other items "like you would find in a trunk." A DuQuoin City Police Officer testified that there had been a report of a burglary at the vacant house on the same date as defendant's arrest. He was also present at the time of defendant's arrest and verified the circumstances and results of the trooper's search of defendant's jacket and automobile.

██ It is established that the constitutional safeguards against unreasonable searches and seizures do not prohibit all searches made without a warrant, but only those which are unreasonable, and that the determination of the reasonableness of any given search must depend upon the facts of the particular situation. (*United States v. Rabinowitz*, 339 U.S. 56, 94 L.Ed. 653; *People v. Watkins*, 19 Ill.2d 11, 166 N.E.2d 433.) A search incident to an arrest is authorized when it is reasonably necessary to protect the arresting officer from attack, to prevent the prisoner from escaping, or discover the fruits of a crime. (*People v. Brown*, 38 Ill.2d 353, 231 N.E.2d 577; *People v. Watkins, supra.*) It has been held that the total absence of license plates on a car could reasonably suggest a serious violation of the law which would justify a search. (*People v. Brown, supra; People v. Watkins, supra.*) Furthermore, the search of an automobile, including the trunk, may be conducted by police officers even after the defendant has been picked up as a mere traffic law violator where the circumstances reasonably indicate that a more serious crime has been committed. (*People v. Brown, supra; People v. Thomas*, 31 Ill.2d 212, 201 N.E.2d 413.) Under the disclosed facts Trooper Miller was fully justified in stopping defendant's automobile to make an investigation. The automobile had only one license plate. The officer started through an intersection, stopped, backed up and turned toward the defendant's automobile, and upon his approach the defendant turned down a rough alley. This occurred in an area where there recently had been

several break ins. When the defendant was unable to produce a drivers license and admitted that he had never had one and also did not have any proof of registration of the automobile but stated he had borrowed it from a friend but declined to name the friend, the arrest of defendant was justified. The discovery of several pairs of gloves on the floor of the back seat of the car and the finding of the straight bladed knife in the jacket which defendant had requested, coupled with the other circumstances attending defendant's arrest, fully justified the officers in conducting a search of the automobile, including the trunk, to protect themselves from attack and to discover fruits of a crime. The circumstances also reasonably indicate that a more serious crime had been committed. We accordingly find that the trial court was correct in denying defendant's motion to suppress the evidence discovered in the search.

Defendant next contends that he was denied a right to a fair trial when he was denied counsel and the right to confront a witness. Defendant's objection in this regard is directed to the preliminary hearing. The record shows that after defendant was arrested he was taken before a magistrate for a hearing on probable cause and to set bail. It was determined that defendant was indigent and the public defender was appointed to represent him. The court then conducted a preliminary hearing at which one of the arresting offices testified. At the completion of his testimony the court asked defendant if he would like to cross-examine. When defendant indicated he would the State's Attorney objected upon the grounds that defendant could not cross-examine because the public defender had been appointed. The objection was sustained even though the public defender was not present. The court thereupon found that probable cause existed and bound defendant over for grand jury action.

■■■ In *People v. Adams*, 46 Ill.2d 200, 263 N.E.2d 490, the court had under consideration the identical contention made by defendant here. They noted that prior to *Coleman v. Alabama*, 399 U.S. 1, 26 L.Ed.2d 387, 90 S.Ct. 1999, it was held that a preliminary hearing does not constitute a "critical stage" in a criminal prosecution so as to give rise to a constitutional right to representation. Preliminary hearings were characterized as proceedings to ascertain a crime had been committed, and to determine whether there was probable cause to believe that the accused has committed the crime. The court in *Adams* acknowledged that the United States Supreme Court held in the *Coleman* case that the preliminary hearing proceeding in Alabama was a "critical stage" in that state's criminal process requiring the presence of counsel, and that the preliminary hearing procedures of Alabama and Illinois are substantially alike, therefore the rule of the *Coleman* decision is applicable

in Illinois. However, the court in the *Adams* case concluded that the directive of *Coleman* was to be applied prospectively only. The *Adams* case disposes of defendant's contention here. Since the decision in *Coleman v. Alabama, supra,* was handed down on June 22, 1970, it was not in effect at the time of defendant's arraignment on June 9, 1970.

The defendant finally contends that the evidence is insufficient to prove his guilt beyond a reasonable doubt. The argument is based principally upon the fact that the goods found in the trunk of the car could belong to his "friend" who owned the car and there is no satisfactory proof that he committed the burglary. Defendant also cites the case of *People v. Slaughter,* 2 Ill.App.3d 834, 277 N.E.2d 775, in which a defendant in possession of stolen checks was exonerated of his conviction of burglary when it was shown that there were several previous break ins coupled with the lack of satisfactory proof that the items in defendant's possession were taken on the date he was alleged to have burglarized the premises.

■■■ We think the evidence is more than ample to justify defendant's conviction. The items recovered by the police from the trunk of the automobile being driven by defendant were identified at the trial by the executor of the estate of the deceased owner of the house as belonging to the deceased, and that the same, prior to the burglary, had been located in the house. Exclusive, unexplained possession of recently stolen goods is evidence of theft and, if at the time the articles were stolen burglary was committed, such possession is also evidence of burglary. Although defendant stated he borrowed the car from "a friend" he refused to identify the friend. A police officer testified that the car defendant was driving at the time of the burglary was impounded at the Du Quoin Police Station until claimed by its owner who was from Indiana. But the recent exclusive possession of the stolen property is not the only evidence of defendant's guilt. Defendant refused to answer any questions or make any statement at the time of his arrest, as it was his constitutional privilege to do. However, on the following day the defendant was taken to the State's Attorney's office at Pinckneyville and in the presence of a police officer and the State's Attorney, and after he was given the *Miranda* warning, he orally admitted that he had gained entrance to the burglarized house with the assistance of three young boys. This admission was properly admitted into evidence and considered by the jury.

■■ The evidence coupled with the admission of the defendant is more than ample to establish the guilt of defendant beyond a reasonable doubt. We have examined the *Slaughter* case and find it inapposite here. It does not establish any new rule of law but rather holds that under

the evidence the defendant's guilt had not been proven beyond a reasonable doubt. To the contrary is the evidence in this case. Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

G. MORAN, P. J., and EBERSPACHER, J., concur.